# Keough, Appellant, *v.* Republic Fuel and Burner Co., Inc.

Argued April 22, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Carl E. Geuther,* for appellant.

*Thomas E. Comber, Jr.,* with him *Perry S. Bechtle,* and *Pepper, Bodine, Frick, Scheetz & Hamilton,* for appellees.

OPINION BY MR. JUSTICE ARNOLD, June 27, 1955:

This is an appeal from the entry of judgment in the court below on a verdict in favor of the defendants. The action is brought in trespass and involves a motor vehicle case under the Wrongful Death Act of 1851, and the Survival Act as embodied in the Fiduciaries Act of 1949. The appeal is based solely on the refusal of the court to allow evidence as to the criminal record of John Rommuno, the driver of the Republic truck, such evidence being offered to affect his credibility.

Wilde Avenue, 23 feet 7 inches wide, and Bond Avenue, 24 feet 8 inches wide, intersect at practically right angles. The decedent, three years of age, was frightened by a praying mantis, ran into the cartway of Wilde Avenue and was struck by the defendant's truck, receiving injuries from which he died. Defendant's truck, travelling on Wilde Avenue had cleared the intersection with Bond Avenue, and travelled 28 feet 4 inches from the north curb of Bond Avenue, and the child was struck by the front of the truck. No horn was sounded and the truck went a distance of 126 feet beyond the point of impact before stopping. The truck driver stopped the truck after being told by the decedent's brother that he had hit the decedent.

A slight contradiction existed between the testimony of one Knopf and the defendant, Rommuno. This was only as to the statement of Knopf that the defendant, Rommuno, said that he thought he hit a dog, and that Knopf was there before the body had been removed. At the trial of the case it appeared that a police officer arrived shortly after the accident and took Rommuno to the police station, where he made a statement. The latter was identical in practically every respect with his testimony at trial. The issue was whether the accident was caused by the sudden darting out of the decedent or by the negligence of the defendants.

The issue of credibility was collateral to the issue of negligence.

The trial was held January 11, 1954. After the defendant testified the plaintiff offered the following pleas of guilty or conviction: October, 1937, larceny; June, 1940, attempted larceny; November, 1942, assault and attempted robbery; October, 1944, receiving stolen goods; October, 1944, burglary and larceny. At the time of the trial Rommuno was but 29 years of age. It follows that he was a boy of 12 at the time of the first criminal case and 19 at the last. The trial judge excluded the offer on the ground that he had a discretion, and that the convictions were too remote in point of time. The appellant contends that he had an *absolute right* to introduce the criminal records against Rommuno.

It will be seen from the foregoing outline that there was nothing in the appellant's position as to the contradictions between the witness, Knopf, and Rommuno. They are of a trifling character and of no importance in this case. The real question is whether on the issue of the credibility of Rommuno as to his version of the accident, the convictions should have been admitted as a matter of *absolute right*.

The criminal cases cited by the appellant are of little moment. Obviously if in those cases the court had excluded evidence of conviction of the defendant, the Commonwealth could not take an appeal. And still obviously, if the defendant is convicted he certainly would not assign as error the exclusion of the evidence as to his prior criminal convictions. But in *Commonwealth v. Varano*, 258 Pa. 442, 446, 102 A. 131, this Court stated: "What questions may be asked on cross-examination to test the credibility of a witness is largely a matter in the discretion of the trial judge." See also *D'Allura v. Perri*, 138 Pa. Superior Ct. 261, 10 A.

2d 124. In *Thompson v. American Steel & Wire Company*, 317 Pa. 7, 11, 175 A. 541, this Court held on the question of the admission of plainly relevant testimony: "He [the trial judge] is constantly faced with questions on evidence in their special relation to the issue to be tried. He must deal with such questions in the light of the purposes of the ultimate inquiry and does so in the exercise of what is known as judicial discretion. He should see that nothing relevant is excluded, so long as its admission will not unduly distract the attention of the jury from the main inquiry. . . His conclusion or decision on such points will not be interfered with on appeal save for manifest abuse of power [discretion]. He must, therefore, determine in the first instance whether evidence which, though logically relevant on the ultimate issue, may nevertheless be excluded, because its general effect on the trial will be to confuse the issue by distracting the attention of the jury from the primary to collateral issues, or by unduly prolonging the trial, or perhaps by unfairly surprising the other side." See also Rule 303 of the Model Code of Evidence, American Law Institute, which reads in part as follows: "(1) The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will. . . (b) create substantial danger of undue prejudice or of misleading the jury."

We therefore derive the rule that there is no *absolute right* to introduce criminal records against a defendant in a civil case, who has testified; but on the contrary it is within the discretion of the court whether such evidence will be admitted, and on appeal this discretion will not be interfered with except for its abuse. In the exercise of its discretion the trial court must view the various aspects of the trial and determine whether the probative value of the offer is out-

weighed by the risk that its admission will create sub-
stantial danger of undue prejudice or of misleading the
jury, and must consider also the remoteness of the
convictions in question from the date of the offer.
Viewed in this light, the trial court was not in error
in rejecting the evidence of prior convictions of the
defendant.

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On the afternoon of March 19, 1951, Michael
Keough, 3 years of age, was playing with seven or
eight other boys of tender years on the lawn of his
home at 1005 Wilde Street in Philadelphia. The juve-
nile group was being diverted by the antics of an
insect known as the praying mantis when the little
animal, which had been performing on a tree, fell from
its perch and leaped to Michael's foot who, suddenly
frightened, ran into the street. At just about this time
a truck belonging to the defendants in this case and
driven by one John Rommuno was proceeding up Wilde
Street on which the lawn bordered. When the driver
first saw the children he was 55 feet away from them
and, according to his testimony at the trial, he reduced
the speed of his truck, aware of the possibility that
one or more of them might impetuously run into the
street. He did not blow his horn or in any other way
herald his coming as he neared the lawn. The tree
which had been the pivotal interest for the children
set back from the curb over 20 feet. The driver had
a clear view of the tree, the lawn, the sidewalk, and
the street. Michael ran from the tree, crossed the side-
walk and when he got into the street the truck was 12
feet away. He had reached the middle of the thorough-

fare when he was hit by the truck which inflicted mortal injuries.

Robert Keough, Michael's eight-year old brother, witnessing the accident, ran after the truck which stopped 128 feet away from the point of impact.

Charles M. Knopf, who lived directly across the street from the Keough home and was painting his house at the time, heard the crying of the children in the wake of the collision, dashed into the street, saw the bleeding form of the child in the cartway and questioned the truck driver as to what had occurred. The driver declared, according to this witness: "I thought it was a dog." The driver denied at the trial that he had made this remark.

The issue at the trial was whether the accident had occurred in the manner described by the defendant or as it was told from the witness stand by the plaintiff's witnesses. The fact that the driver saw the children playing close to the street, the fact that there was a school house only three blocks away and the fact that the accident happened only 20 feet away from the intersection (Wilde and Bond Streets) which he had just traversed, all commanded to the driver the maximum of care in proceeding past the lawn loud with the children's playing. Robert Keough testified that his brother Michael ran 32 feet from the tree to the point of impact. Since Michael's path of travel was bathed in broad daylight with no object obstructing the driver's view of it, and since it was not denied that the driver failed to blow his horn, it is inevitable that if the accident developed in the manner related by Robert, John Rommuno should be made to answer to a charge of negligence.

On the other hand, if Rommuno's story is believed he must be exculpated from any imputation of negligence because his version of the happening was that

he had already gotten past the children, so far as his view was concerned (on account of the height of his cab) when the accident occurred.

The jury was thus presented a precise question of fact with both versions clashing head-on as to which should prevail in truth and justice. Each story standing by itself was persuasive, but taken together *one had to be untrue*. To believe one side, the jury had to reject the other's version of the tragedy. This rejection, however, if there was to be any show of justice, could not be arbitrary or capricious. It had to be guided by logic, reason, and the law of cause and effect. And thus came the real issue—credibility.

Which side was to be believed over the other? In an impasse of this kind with both sides telling plausible stories, the jury has to look for possibly concealed motives behind the testimony. Motive is the touchstone of credibility. Did the plaintiff's witnesses have a personal advantage to gain in perverting the facts? Did John Rommuno have a personal axe to grind in fabricating a falsehood?

Plaintiff's counsel desired to show at the trial that Rommuno (aside from the verdict in this case) had a great deal to gain for himself by concealing the truth. Rommuno had a criminal record and at the time of the accident was actually on parole for a very serious crime committed by him. On November 2, 1942, he had been sentenced to from two years to ten years for the crime of assault and attempted robbery with an offensive weapon. The accident occurred on March 19, 1951. Rommuno was thus, in 1951, still within the punitive jurisdiction of the State Parole Board. He could thus still be returned to prison if it was shown that he had conducted himself in any manner violative of the strict pattern of behavior required of parolees.

If Rommuno approached the scene of the playing children by transgressing against any of the laws of the highway and accidental death resulted he could even be convicted of involuntary manslaughter. From a selfish point of view, therefore, Rommuno had considerable motive to misrepresent the facts. Whether he did or did not actually play fast and loose with those facts became a secret locked up in the compartment of his own mind and conscience. The key to unlock that secret compartment could be forged only from the materials of his known character. What was his character? Was he a person who would lie for personal advantage? Was he an individual who would set himself up against truth, law and morality? How could anyone answer such questions except by studying his history? To that end plaintiff's counsel wished to reveal the history of John Rommuno so far as it had a bearing on his proclivities for truth or falsehood. Past actions are more accurately the record of a person's reliability than his present words when his own liberty and fortune are at stake.

Without being informed that John Rommuno had ever been other than what he appeared to be—a person of high integrity—the jury took him at his word. But was his testimony to be accepted as legal tender in the market of reliability when it was seriously challenged as it was in this case? Would the jury have reduced the value of his word if they had known that Rommuno had a criminal record which could remand him to prison if it appeared he had violated any of the rules of probation? Of course, anyone can reform and it is possible that Rommuno could have been relating only absolute fact, but the jury had the right to know the depth of the well they were plumbing for truth. That Rommuno lied in the past would not prove he was lying today, but it cannot be doubted that one who

has previously broken a leg may be more apt to limp than one who never broke a leg.

Had the jury known of the defendant's criminal record they might also have probed more keenly some aspects of his story. For instance, Rommuno said that when he passed the lawn the children were on the lawn 20 to 30 feet away. If this is true, how could Michael have traversed that distance to reach the truck, strike his head against it with sufficient force to kill himself, before the truck was beyond the direct line of his flight from the lawn?

The Majority treats Rommuno's criminal record rather lightly by saying that he "was a boy of 12 at the time of the first criminal case and 19 at the last." But that means seven years of criminality! Seven years of defiance of law during the most formative periods of a person's life. Moreover, a glance at Rommuno's criminal record will show that his crimes were not mere apple-stealing peccadillos. They were crimes of drawn-dagger feats of bravado and violence. On October 5, 1937 he was sentenced on larceny and placed on probation for one year; on June 7, 1940, he pleaded guilty to attempted larceny and was sentenced to two years' probation; on November 2, 1942, he was sentenced to from 2 to 10 years "for assault, being armed with an offensive weapon and attempt to rob"; on October 2, 1944, he pleaded guilty to larceny and receiving stolen goods; on October 4, 1944, he pleaded guilty to burglary and larceny and was sentenced to a term in the Eastern State Penitentiary.

In weighing the probabilities of the case as to who was more faithful to integral truth, the jury would undoubtedly have been interested in knowing that John Rommuno was for seven years arrayed against the forces of truth and honor. In *Weiss v. London, Ltd.,* 285 Pa. this Court said: "The rule is that a witness

may be asked as to his conviction of such crime as affects his credibility, but not as to his alleged violation of the criminal laws, disconnected with the case on trial, for which he was never convicted."

It is not questioned in the case at bar that Rommuno was either convicted or pleaded guilty to the crimes enumerated in his criminal record.

The paradox of the Majority's Opinion is that it admits that the revelation of Rommuno's criminal record would have affected the jury but it advances the strange argument that that is the reason why it was properly withheld from them. In other words the Majority contends that Rommuno's chronology of criminality, which is seven years wide in a life of only 29 years, should not be known to the judges of his conduct which involved the death of a three-year old child. The Majority feels that this knowledge might have lessened the jury's appreciation of Rommuno's reliability. But that is the very good reason why it should have been admitted!

The Majority concludes that "the issue of credibility was collateral to the issue of negligence." How could it be collateral? Credibility was the very foundation of this case, as it is in every case. Credibility in a trial is what a compass is to a ship, an altimeter to an airplane, a sight to a gun, and a scale to a customer in a butcher shop. Without a standard for measuring direction, height, accuracy, or weight, how does one know what is true or not true?

How can we determine negligence unless we first decide that we can believe the person who is telling the story of alleged negligence or non-negligence? Without credibility to back up any story told from the witness stand, the witness's testimony is as meaningless as a sack of feathers thrown to the winds. The Majority assumes that because Rommuno told on the

witness stand the same story he told to the police, this fact strengthens his reliability. But this does not follow. Rommuno had had a great deal of experience with police, law and the courts. Before giving his statement to the police he had ample time to decide on a flat denial of all knowledge which would convict him of negligence. Nevertheless it will be noted, in reading the record, that in his eagerness to deny Knopf's implicating statement, he somewhat revealed his set determination to deny everything: "Q. Did you or did you not tell Mr. Knopf— A. *(Interposing)* No, I didn't. Q. Wait until I finish my question. Did you or did you not tell Mr. Knopf, after you completed telling him how the accident occurred, that you thought that the bump, or that you had come in contact with a dog? Did you tell him that? A. No, I didn't." *

The Majority misconceives the whole issue in this case. It says that "A slight contradiction existed between the testimony of one Knopf and the defendant, Rommuno. This was only as to the statement of Knopf that the defendant, Rommuno, said that he thought he hit a dog, and that Knopf was there before the body had been removed." The Majority emphasizes this by adding: ". . . there was nothing in the appellant's position as to the contradictions between the witness, Knopf, and Rommuno. They are of a trifling character and of no importance in this case." I fail to see that the contradictions were trifling. Knopf said that the defendant admitted he had felt a thump at the rear of his car and thought it was a dog. Is that trifling? Even if it had been only a dog he might have stopped to see what had happened to the dog. He travelled 128 feet before stopping and then came to a halt only because of the pursuing cries of Robert. In the light of

---

* Italics throughout, mine.

the circumstances, would the jury not have the right to assume that Rommuno did not stop short of 128 feet only because he was travelling at a high rate of speed? And then there were numerous and vital contradictions between Rommuno's and Robert's testimony: Rommuno said he stopped at the street intersection before passing the lawn; Robert contradicts this. Rommuno said Michael hit the car; Robert testified Rommuno struck the child with the front end of his truck; Robert testified that Rommuno did not blow a horn upon approaching the lawn; Rommuno made no comment on this.

These and other contradictions in the case are not trifling; they go to the very heart of the issue of negligence, and had the jury known of Rommuno's criminal record a light could well have been shed on these contradictions.

No one questions what the Majority belabors in its Opinion, namely, that a Trial Judge has judicial discretion in certain matters of admissibility of evidence. The plaintiff here does not speak of "absolute right" to have the criminal record of the defendant introduced. What the plaintiff asserts, and properly so, is that the Trial Judge abused his discretion. The learned Trial Judge was convinced that the criminal record was relevant to the trial and so stated with cogency and conviction: "Per se, the evidence was admissible to affect credibility. Convictions of crime may be shown to impeach credibility where the crime is a felony or a misdemeanor *crimen falsi*. This type of crime goes to a person's capacity for truth. A person who shows immorality is apt to have less scruple; at least, a fact-finding body may so consider it, to reach a conclusion of belief or disbelief. A person who shows the badness implicit in a serious crime, or the crime properly labeled *crimen falsi*, demonstrates a far

enough departure from veracity to show a leaning to falsehood."

The Judge feared, however, that the introduction of the evidence might confuse the jury. The Majority takes this same view and adds that the Trial Court must "determine whether the probative value of the offer is outweighed by the risk that its admission will create substantial danger of undue prejudice or of misleading the jury, and must consider also the remoteness of the convictions in question from the date of the offer."

Remoteness is not of itself an excluding criterion. If ten years prior to the accident the driver had had defective vision, who can doubt that it would be proper to introduce a medical record of that fact? There is such a thing also as mental-moral myopia, astigmatism and strabismus. Of course, there was no intention on the part of the plaintiff to show by Rommuno's criminal record that he purposely ran down Michael Keough. The object of the criminal record was to demonstrate that for a long period of time Rommuno had manifested a certain vicious disregard of the rights of others. He had been physically violent, he had used offensive weapons, he had broken into other people's homes and he had carried away other people's property. For seven years he had done this. A person with that kind of a background would not, as plaintiff's counsel says: "be particularly solicitous of the rights of others on the highway, and would not represent the careful, considerate employee to whom should be entrusted the operation of a heavy vehicle that brings him into constant contact with the public—and with children."

To say that the jury might have been misled is to bestow little credit on the jury or the Judge. In the capable hands of the Trial Judge in the court below it would have been a simple matter to instruct the

jury that the criminal record was to be considered only as to the very narrow question of credibility. If the subject of a past record can be handled with care and with due and proper safeguards in criminal trials, certainly a judge should have no difficulty in finding the language which would clothe the witness with ample protection against possible anger and resentment and yet sufficiently reveal what has been his disposition toward truth in the past.

It is to be noted further that one of the allegations of negligence in the Complaint in Trespass declares: "The defendant Republic Fuel and Burner Co., Inc., was further negligent, which negligence was the proximate cause of the injuries to Plaintiff's decedent, in that it entrusted the control, management and operation of its said automobile to the defendant John Rommuno under circumstances whereby it either knew, or, in the exercise of reasonable care, should have known, that the said John Rommuno was a totally unfit person for such assignment in that: (a) He was incompetent to operate an automobile with due regard to the safety of others lawfully on the highway, including plaintiff's decedent. (b) He had exhibited over a long period of time, and could reasonably have been anticipated to have retained, a total disregard for the personal safety of others, including plaintiff's decedent." In discussing a question of similar character in the case of *Raub v. Donn,* 254 Pa. 203, 206, this Court said: ". . . since the fact that young Donn was a reckless driver, and had the reputation of being such, 'which fact was then and there known or ought to have been known to the said Frank Z. Donn', *was averred in the plaintiff's statement,* we cannot say that, under the evidence at bar, error was committed in submitting this issue to the jury, or in saying to them, 'It is the duty of a man to see that his automobile is not

run by a careless, reckless person, but that it is in the hands of a skillful and competent person.' "

Thus the plaintiff should have been allowed to introduce Rommuno's criminal record if only in verification of the allegations in his Complaint in Trespass.

Of course, no one can say what the jury's verdict would have been, had they known Rommuno's criminal record. One thing, however, is certain and it is this: In the present state of the record, one can logically conclude that the lowering of the curtain of concealment over Rommuno's violent past threw at the same time a pall of darkness over the deliberations of the jury on the most vital issue in the case—credibility— and to that extent it may well have contributed to an act of great injustice.